[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On October 11, 2001, the Department of Children and Families, (hereinafter, "DCF"), filed a petition to terminate the parental rights of the mother and father of Miracle M., born on June 2000. Both parents, Garnetta H., mother, and Kevin M., father, were duly served in hand with notice of the petition. They appeared for the plea hearing and were appointed counsel to contest the petition. Trial on the petition was held CT Page 6769 on May 1, 2002.
At trial, DCF introduced five exhibits and the testimony of Miracle's pediatrician, Dr. Jayashree Venkatesh, two assigned social workers, Lyndon Gill and Zaira Reyes, and Pamela P., Miracle's foster mother. Kevin M. called his mother, Delores M., as a witness and testified on his own behalf The mother and the child's attorney called no witnesses. Garnetta H., although aware of the hearing date, did not attend the trial.
For the reasons stated below, the court grants the petition for termination of parental rights.
 I FACTUAL FINDINGS
The credible and relevant evidence offered at trial, and a review of the judicially noticed court records, supports the finding of the following facts by clear and convincing evidence:
A. Case History
On September 11, 2000, a neglect and uncared for petition and a motion for temporary custody were filed by DCF on behalf of Miracle. An ex parte order of temporary custody was granted on the filing date and sustained by agreement on September 15, 2000, after a preliminary hearing attended by both parents. On the date this court granted the ex parte temporary custody order, it also issued preliminary specific steps for both parents, informing them what efforts might be required in order to regain custody of Miracle. They were advised, inter alia, to keep all appointments with DCF, keep their whereabouts known to DCF and their attorneys, participate in parenting and individual counseling, learn to treat the child's specialized medical needs, participate in substance abuse evaluations and follow recommended treatment, visit Miracle as often as DCF permitted, secure and maintain stable housing and legal income, engage in no further substance abuse and have no further involvement with the criminal justice system.
Final specific steps were approved by the court, (Turner, J.) on December 18, 2000, when Garnetta and Kevin agreed to adjudicate Miracle neglected and uncared for and commit her to the custody of DCF. The final specific steps were substantially similar to the preliminary steps issued on September 11, 2000. Both parents signed the final specific steps form, acknowledging, ". . . . that failure to achieve these specific steps will increase the chance that a petition may be filed to terminate my parental rights permanently so that my child may be placed in CT Page 6770 adoption. I understand that I should contact my lawyer and/or DCF worker if I need help in reaching any of these steps."
On August 7, 2000, the court heard DCF's motion for review of a permanency plan, found by clear and convincing evidence that efforts to reunify Miracle with either parent were no longer appropriate, and approved a plan for termination of parental rights and adoption. DCF filed this petition on October 11, 2001. On November 14, 2001, the court granted DCF's motion to maintain Miracle's commitment. At that same hearing, also the plea date for the petition for the termination of parental rights, Garnetta and Kevin were advised of their rights and appointed counsel.
A. Mother, Garnetta H.
Garnetta H. is now 42 years old. She has given birth to four children, but has never been married. She never finished high school and has a sporadic employment history. Her nuclear family has a history with DCF dating back to 1992 due to substance abuse, homelessness and abandonment of her children. Her three older children previously were committed to DCF care. Two of them have reached the age of majority. Another child, Dwayne, now 17, who has a history of truancy, problematic behavior in school and delinquent acts, declined DCF services at the age of 16 after a year of protective supervision. It is uncertain where Dwayne resides at present. Over her decade of involvement with DCF, Garnetta has failed to comply with services or to successfully address her parenting deficiencies and long term abuse of alcohol and cocaine.
When Miracle was born on June 30, 2000, DCF treatment worker Lyndon Gill was already assigned to Garnetta's case due to the open case on her son, Dwayne. Garnetta did not have her own apartment and was living with her grown daughter, Destiny, the daughter's two children, Kevin M. and Dwayne in a two-bedroom apartment.
Kevin and Garnetta met about two years before Miracle's birth when they were both in a drug rehabilitation program. Kevin knew Garnetta used illegal drugs throughout her pregnancy. Although DCF referred Garnetta to intensive outpatient substance abuse treatment at ADRC for three separate evaluations while she was pregnant, she failed to attend any. In March 2000, Garnetta checked into the inpatient Reid treatment center, but stayed only two days. She claimed she lost her medical card, but Gill testified this would not have prevented her from staying in the program.
On July 10, 2000, St. Francis Hospital reported to DCF that Garnetta had given birth prematurely to a baby girl on June. Miracle weighed less than two pounds at birth and had to be placed on a respirator in an CT Page 6771 intensive care unit. Miracle's urine had screened negatively for drugs at birth, but on July 7, a meconium test came back positively for cocaine. The hospital was concerned that Miracle might be at risk if discharged to the custody of her parents.
Gill was assigned to Miracle's case. St. Francis Hospital personnel informed him that Miracle required a lot of medical care due to complications from prematurity, and that she would have to stay in the hospital for an extended period of time. Gill met with Garnetta and recommended that she enter an inpatient drug rehabilitation program that would allow Miracle to live with her. He suggested Amethyst House, an eighteen-month program in New Haven. Garnetta agreed to start the program and have Miracle join her when Miracle was strong enough to be discharged.
Garnetta left the hospital on July 1, 2000. Between July 1 and August 9, Garnetta never visited Miracle in the hospital. Garnetta entered Amethyst House on August 9, but stayed only a few weeks. During her brief stay, on August 17, Gill transported her from New Haven to the hospital for one visit with the baby.
Garnetta claimed she left Amethyst House because it was not close to Hartford, so Gill tried to locate a similar inpatient program in the Hartford area for her. He brought Garnetta to an intake appointment at Coventry House, which also allows infants to reside with their mothers, and a bed was made available for her the following week, even though other potential clients who had been waiting longer for a bed had to be bumped. Garnetta was supposed to enter Coventry House a week after her intake appointment; she never did.
On September 11, 2000, Miracle, now cleared for discharge from the hospital, was placed in the temporary custody of DCF by court order. Garnetta appeared at the preliminary hearing on the temporary custody order and agreed to sustain it.
During Miracle's hospitalization, Garnetta had only visited Miracle once and called hospital officials just three times to inquire as to the child's status. Gill continued to send letters to Garnetta offering her weekly, one hour visits at the DCF office on Hamilton Street in Hartford. He offered to send a case aide to pick Garnetta up for visits and also offered to purchase a bus pass. As of the date the petition for termination of parental rights was filed, on October II, 2001, Garnetta had missed about 95% of her weekly visits. She visited Miracle only twice in over a year: once in August 2000 and once in September 2000. She gave Gill various excuses, including stating that she had lost the bus pass. CT Page 6772
Gill attempted to meet with Garnetta to address her need for substance abuse treatment. He gave her a list of programs she could call to arrange inpatient treatment. She never followed through with these referrals. During the time Miracle remained in foster care, Garnetta contributed no support for Miracle, and sent her no cards, gifts or letters. She did not maintain regular contact with Gill to see how her daughter was faring. She failed to keep Gill informed as to her whereabouts subsequent to her daughter's eviction from the apartment she shared with Garnetta. Her whereabouts was unknown to Gill between December 18, 2000 and May 31, 2001, when she finally called Gill to inform him she was living somewhere else with her older daughter.
When Garnetta attended the plea hearing for the petition for termination of parental rights on November 14, 2001, she gave Gill another new address. However, by December 2001, when Gill transferred the case to another worker, Zaira Reyes, Garnetta's whereabouts were again unknown. Reyes, the new worker, got a telephone call from Garnetta at the end of January 2002. Garnetta informed Reyes she now was living with a friend in New London and stated she wanted to resume visits with Miracle. Reyes arranged biweekly visits and transportation, but Garnetta only made one visit, on March 1, 2002, between January and the date of this trial, May 1, 2002. Reyes observed this visit and noted that Garnetta didn't know what to do when the child cried.
Reyes subsequently determined that the "friend" with whom Garnetta was living in New London moved and as of the date of trial, Reyes had no current address for Garnetta. There is no evidence that Garnetta ever found employment or stable housing. Her source of income, if any, remains unclear. There is no evidence she ever attended a parenting program or any kind of substance abuse treatment program, inpatient or outpatient.
B. Father, Kevin M.
Kevin M. is 45 years old and has a high school diploma. He has held janitorial jobs in the past. His last employment was at Burlington Coat Factory until August 2000, a month and a half after Miracle's birth. Kevin M. has a criminal history that dates back to 1976, with several convictions for illegal possession or sale of drugs. Since Miracle's birth, he has been arrested and has served a 60-day jail sentence for larceny, and also has been convicted of another larceny and breach of the peace. According to Reyes, his latest conviction is for criminal trespass, but Kevin has been sentenced to serve one year, he says, due to his past record. Kevin has at least one other child, a grown son, but the extent of his involvement in that child's life is unknown.
After Miracle's birth, Gill worked diligently to engage Kevin as a CT Page 6773 potential caretaker, as Kevin was visiting Miracle regularly, at least three times a week, according to Kevin, while she remained in the hospital. Kevin admitted that Gill "told me he wanted me to have a chance at custody." Gill met with Kevin on a few occasions at Dunkin Donuts. Kevin was temporarily staying with his mother and had no apartment of his own. Gill and Kevin discussed other relatives as optional placements, but Kevin's mother, Delores, felt she was too old and not healthy enough to provide the special care required for Miracle. Kevin's sister is mentally ill, and a brother, Reginald, initially did not come forward. Gill tried to persuade Kevin to try to stay with his mother and care for Miracle, but Kevin rejected the idea. Kevin did try to persuade Garnetta to cooperate with the Amethyst House placement. He says he bought clothes and other necessary items for the baby and gave them to Garnetta, not DCF.
Kevin testified and described his situation after the birth. He was on parole and had a lot of programs to do, so caring for the baby was "really impossible for me at that time." He felt he was not responsible for Miracle's medical condition, and doesn't see why he should be blamed for all the "mayhem" that took place. He complained that DCF was "coming at me like I was doing something wrong." He also stated he did not understand that Gill was also his assigned social worker, since he "wasn't on state or nothing."
After Miracle was discharged from St. Francis Hospital on September 18, 2000, Gill, per Kevin's instructions, sent letters to set up dates and times for visits with the baby to Kevin's mother's address. Kevin also attended court on September 15, 2001, and again on December 18, 2001, when he signed final specific steps, which were approved by the court. Between those two court dates, Kevin served a 60-day sentence for larceny.
In signing specific steps, Kevin acknowledged what he needed to do in order to try to regain custody of Miracle. Included in the steps was attendance at parenting classes and a substance abuse evaluation and a urine screen. On January 11, 2001, Gill made referrals for Kevin to ADRC for a substance abuse assessment and to the Village for Families for a parenting program. Kevin was notified by mail of the date and time of these appointments, but he did not attend. When Kevin attended the plea hearing on the termination petition on November 14, 2001, he brought his brother and sister-in-law with him and asked Gill to consider them as a placement option for Miracle. Gill visited their home and explained the licensing process to them.
After Miracle left the hospital, Kevin did not visit her until November of 2001, one month after the petition for termination of parental rights CT Page 6774 was filed. Kevin visited Miracle twice that month after Gill unexpectedly ran into him while Kevin was repairing a driveway at a property near the DCF Hartford office on Hamilton Street. Kevin's mother, Delores, attended these visits and noted that Miracle didn't seem to know who Kevin was, although she played with Kevin during the visit. On the day of a third scheduled visit last November, Delores showed up without Kevin and told Gill that Kevin had been incarcerated.
When Gill transferred the case to Reyes, Kevin called Reyes inquiring as to the status of his brother's application for a foster care license. The application had come to a standstill because Kevin's brother and wife had not submitted all the required information. They also have had no contact with Miracle since Olga, Reginald's wife, came once to a visit in November of 2001 with the grandmother. Reginald has never seen Miracle.
Reyes informed Kevin by letter that he could have visits once a month at the correctional facility, but Kevin never asked for visits.
Kevin offered no evidence of any programs he may have participated in while incarcerated that could have helped address his specific steps with regard to parenting or substance abuse counseling. Kevin failed to always keep his whereabouts known to DCF and failed to contact DCF regularly to inquire as to Miracle's well-being. Kevin sent no cards, gifts or letters to DCF or the foster home. He has not paid any regular child support. He testified at trial that when he is released, "as soon as I get a job after I get out" he might be able to care for Miracle, although he acknowledged that she needs a lot of care, and that he will be on probation for four years upon release, a situation, which, in the past, prevented him from caring full time for his daughter. He also expressed concern that parenting should be a 50-50 proposition, and that both parents should be involved despite the testimony he heard about Garnetta's poor level of involvement. He feared the state was "putting a lot of obligations on me."
At the close of his testimony, Kevin indicated that he had done what he could do, and that he didn't mind if Miracle stays with her foster mother, Pam P., whom he considered a "wonderful lady," as long as "I can keep my parental rights."
D. The Child. Miracle M.
Little Miracle Angel M. — aptly named — has been in foster care most of her life. Born at 27 weeks gestation, exposed to cocaine, she was not expected to survive after her birth on June 2000. She weighed less than two pounds and was less than 8 inches long. She required neonatal intensive care, including intubation and a respirator. CT Page 6775
In mid-September, Miracle, then two and a half months old, was discharged to the P. foster home, a specialized, medically fragile home.
Miracle's pediatrician, Dr. Venkatesh, testified that Miracle has great difficulty with oral feedings. Swallowing problems are common for premature babies exposed to drugs during pregnancy. Her feeding difficulties necessitated the insertion of a G-tube, a polyester feeding apparatus surgically inserted in her abdominal wall which connects the exterior part of the body with the interior of the stomach. Miracle must be fed very specific amounts of a special formula in accordance with a rigid schedule. Timing is crucial. The training of a caretaker responsible for administering feedings through a G-tube takes seven weeks of classes, and after that, about six months to a year to really get a handle on the situation. The necessity of the G-tube requires frequent follow-up visits to a specialist in gastroenterology because these tubes can get blocked and infected. A visiting nurse came to the foster home once a week until the foster mother learned the G-tube procedure.
Miracle has other problems in the areas of motor skills, speech and neurological developments. She has been diagnosed with dyplegic cerebral palsy, an improper condition of leg muscle tone which has delayed her ability to walk or stand. As a result of these concerns, she is enrolled in the Birth to Three programs for physical and occupational therapy. Miracle's foster mother has had to learn a series of exercises which she administers to Miracle daily. Miracle sees an orthopedist for the diplegia and a neurologist for developmental assessments to detect anticipated cognitive impairments. Miracle also receives speech therapy, as she can speak only a few words. Her foster mother also brings Miracle to aquatic therapy. Miracle is also susceptible to respiratory problems typical of premature babies in cold weather. Their lungs tend to become inflamed due to the smallness of the airways.
As a result of tremendous medical interventions and the efforts of the foster parents, Miracle is beginning to eat food orally during the day. She can crawl, walk with her walker, and pull herself to stand. She stands on her tiptoes, and has to wear braces and perform special exercises to learn to stand flat footed. Mrs. P., who does not work outside of the home, estimated that Miracle's special care and supervision require four to five hours a day over and above the care a toddler ordinarily needs.
Miracle is very much a part of the P. family. She speaks very little, but calls Mrs. P. "Mommy," and exhibits signs of separation anxiety when she is not with her foster mother. She has begun to attend daycare a few hours a week in order to learn to socialize with other children. The P. CT Page 6776 family would like to be considered as an adoptive home for Miracle.
 II ADJUDICATION
Each statutory basis set out in General Statutes § 17a-112 (j)(3) is an independent ground for termination. In re Baby Girl B.,224 Conn. 263, 618 A.2d 1 (1992). The petitioner is required to prove one or more of the grounds alleged as to each parent in its petition by clear and convincing evidence. The petition alleges abandonment and failure to rehabilitate as grounds for the termination of both Garnetta and Kevin's parental rights. It also alleges the additional ground of no ongoing parent-child relationship as to Kevin. General Statutes §§ 17a-112 (j) (3), in pertinent part, provides for termination if "(A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;" and "(B)(i) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding. . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child;" and "(D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment. In re Joshua Z.,26 Conn. App. 58, 63, 597 A.2d 842 (1991), cert. denied 221 Conn. 901
(1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both issues is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979). In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied 203 Conn. 804, 525 A.2d 519 (1987); In re
CT Page 6777Emmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904, cert. denied231 Conn. 915, 648 A.2d 151 (1994); In re Tabitha P., 39 Conn. App. 353,360, 664 A.2d 1168 (1995).
A. Reasonable Efforts Finding
Unless a court has found in an earlier proceeding that efforts to reunify are no longer appropriate, DCF, in order to terminate parental rights, initially must show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. State. Sec. 17a-112 (j)(1). "Reasonable efforts means doing everything reasonable, not everything possible." In re Jessica B.,50 Conn. App. 554, 566, 718 A.2d 997 (1998).
On August 7, 2001, this court found, by clear and convincing evidence, that reunification efforts were no longer appropriate with Garnetta and Kevin. Prior to that hearing, both parents had been issued preliminary specific steps in September 2000, and also had signed a form on December 18, 2000 setting forth what specific steps were expected of them in order to regain custody of Miracle. The final specific steps were accepted and approved by the court at the time of Miracle's commitment. The efforts DCF made to reunify Miracle with both parents and their lack of compliance with their specific steps is fully discussed on pages two through nine of this decision.
The court finds by clear and convincing evidence that DCF made reasonable efforts to locate both parents and to reunify Miracle with them prior to the court's finding that efforts were no longer appropriate. Garnetta and Kevin were unable or unwilling to benefit from reunification efforts prior to that same finding. Although the parents' whereabouts weren't always known to DCF, it is clear they had actual notice of the proceedings and were advised of the steps they needed to take in order to reunify.
DCF's efforts were hindered by the parents' lack of cooperation, their failure to keep DCF consistently advised of their whereabouts and Kevin's ongoing criminal behavior and consequent incarcerations.
B. Abandonment — C.G.S. § 17a-112 (j)(3)(A).
This ground, alleged as to both Garnetta and Kevin, is established when the child has been abandoned by the parents in the sense that the parents have failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. CT Page 6778
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In Migdalia M., 6 Conn. App. 194, 209,504 A.2d 533 (1986). However, negating allegations of abandonment "does not contemplate a sporadic showing of the indicia of interest, concern of responsibility for the welfare of the child." In re Kezia M.,33 Conn. App. 12, 18, 632 A.2d 1122, cert. denied 228 Conn. 915,636 A.2d 847 (1993).
 "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted." In re Kezia M., supra, 33 Conn. App. 17-18; In re Roshawn R., 51 Conn. App. 44, 53, 720 A.2d 1112
(1998).
It is indisputable that Garnetta and Kevin have fallen far short of the above standards for exhibiting interest, concern or responsibility. It would be an exaggeration even to refer to their level of interest as "sporadic." Moreover, Miracle is a child who requires more than the "commonly" understood obligations of parenthood; her care will entail more than "minimum attributes."
There is no question that Garnetta never was prepared to be a mother to her baby. Miracle's pending birth didn't cause her sufficient concern to refrain from using toxic substances during her pregnancy. After Miracle's birth, Garnetta was discharged from the hospital on July 1, 2000; she didn't visit the struggling Miracle again until Gill brought her back to St. Francis on August 17, 2000. She made three phone calls to the hospital between July 1 and September 18, the date of Miracle's discharge. She rejected two very supportive residential programs that would have assisted her in addressing her drug problem while learning to care for Miracle. Since July 1, 2000, she has visited Miracle only three times. Like the mother in the case of In re Angellica W.,49 Conn. App. 541, 551, 714 A.2d 1265 (1998), Garnetta "pursued her personal. . . . and substance abuse interest with greater devotion and vigor than she engaged in establishing or maintaining a relationship with [the child]; the mother completely abdicated her parental role." CT Page 6779
Kevin has been incarcerated since November 2001. He endured another incarceration of 60 days at the end of 2000. Although incarceration alone does not conclusively prove abandonment, he was not incarcerated at the time Miracle entered foster care in September of 2000. Kevin agreed to Miracle's commitment in December of 2000 and he signed specific steps. However, he has consistently indicated to DCF that he cannot offer himself as a primary caretaker for his daughter. His notion of parental concern entails volunteering uncommitted relatives as placement options. Kevin was offered weekly visits with Miracle after she was placed, yet he attended no visits for the first 14 months Miracle was in foster care, and he has not seen her since his two visits in November of 2001. He failed to notify DCF of his incarcerations; the social worker had to locate him by contacting his mother, Delores.
Kevin chose not to ask for visits while incarcerated although Reyes offered them to him. He presented no evidence of any programs he may have attended while in the correctional facility to improve his status as a potential custodial parent. Imprisonment of a parent does not alone constitute abandonment of a child; however, the inevitable restraints imposed by incarceration do not in and of themselves excuse failure to make use of available though limited resources for contact with the child and self-improvement. Kevin made little effort to even call and inquire as to Miracle's well-being, nor did he diligently pursue his request that his relatives be considered. He was unaware of the status of his relative's efforts to be considered as a foster placement for Miracle. Inre Juvenile Appeal, 187 Conn. 431, 442, 446 A.2d 808 (1982); In reTerrance C., 58 Conn. App. 389, ___ A.2d ___ (2000)
Neither Garnetta nor Kevin has sent Miracle any cards or gifts since she entered care, nor did they make regular phone calls to DCF to inquire as to her fragile well-being. They have not contributed any financial support for her.
Statutory abandonment on the part of the parents has been proven by clear and convincing evidence. They have not manifested a consistent, prolonged and reasonable degree of interest, concern or responsibility as to Miracle's welfare. In re Rayna M., 13 Conn. App. 23, 37-3 8,534 A.2d 897 (1987); In re Shavoughn K., 13 Conn. App. 91, 97,534 A.2d 1243 (1987), cert. denied 207 Conn. 805, 540 A.2d 374 (1988),rev'd on other grounds, 215 Conn. 31, 504 A.2d 203 (1990); In re MichaelM., 29 Conn. App. 112, 121-123, 614 A.2d 832 (1992).
C. Failure to Rehabilitate — C.G.S. § 17a-112 (j)(3)(B)(i).
This is the second ground for termination alleged against both Garnetta and Kevin. If the parents of a child who has been found by the superior CT Page 6780 court to have been neglected or uncared for in a prior proceeding fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child, this ground for termination exists.
The evidence is clear and convincing that Miracle was adjudicated neglected and uncared for and committed to DCF on December 18, 2000.
Personal rehabilitation, as used in the statute, refers to the restoration of the parent to a constructive and useful role as a parent. In Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986). In assessing rehabilitation, "[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." Inre Mariah S., 61 Conn. App. 248, 261, ___ A.2d ___, cert. denied255 Conn. 934, ___ A.2d ___ (2001); In re Amneris P., 66 Conn. App. 377,384-385, 784 A.2d 457 (2001).
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. Inre Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M.,19 Conn. App. 371, 377, 562 A.2d 566 (1989).
The evidence in this case is clear and convincing that Garnetta and Kevin, as of the date of the filing of the termination petition on October 11, 2001, had not achieved a reasonable degree of rehabilitation, and there is no evidence of conduct prior or subsequent to the date of the filing of the petition which would encourage the belief that within a reasonable period of time, considering the age and needs of their daughter, they could assume a responsible position in her life.
A parent's compliance with specific steps or service agreements set after the adjudication of the neglect or uncared for petition are a relevant and important consideration in reaching a rehabilitation finding. General Statutes §§ 46b-129 (j) and 17a-112 (j)(3)(B); Inre Shyliesh H., 56 Conn. App. 167, 170, 743 A.2d 165 (1999); In re SarahAnn K., 57 Conn. App. 441, 445-450, ___ A.2d ___ (2000); In re MariahS., supra. 61 Conn. App. 241. The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parenting than the parent was at the time of the commitment. In re Michael M., supra, 29 Conn. App. 126. CT Page 6781
On pages two through nine of this decision, the court discusses the specific steps issued to advise both parents what would be expected of them in order to have Miracle returned to their care, DCF's efforts to provide services, and the parents' lack of cooperation and compliance with the specific steps.
The evidence is clear and convincing that the parents have not achieved a status where they are more able to parent Miracle than they were at the time of Miracle's initial commitment. In fact, their respective situations have deteriorated between the date of Miracle's entry into foster care and the date of trial. Garnetta's whereabouts, as of the date of trial, were unknown to DCF or her own attorney. Kevin remains incarcerated and will not be eligible for release until the end of this year. There is no evidence to conclude that rehabilitation into the role of a constructive parent could be achieved by either parent within a reasonable period of time. They have maintained no relationship with Miracle and have not commenced any of the required reunification services. Kevin is asking that the court place Miracle with relatives whom she does not know. The issue is not how much longer they might take to rehabilitate; the problem is that they still have not started. Both of them have been unwilling or unable to step into a responsible parental role for a child whose caretaker must be considerably well-trained in order to safely care for her. Miracle particularly needs a caretaker who can adhere to schedules and keep appointments, simple life skills that Garnetta and Kevin have failed to acquire.
In light of the parents' prolonged disinterest toward a daughter both knew was struggling to survive, further delay in this case in an attempt to begin rehabilitating Garnetta, if she can be located, or Kevin, if he consents to assuming Miracle's care, would be injurious to Miracle. After nearly two years of foster care, she is securely attached to her foster parents, who are willing to provide her with a permanent, stable and loving home, a home that will insure Miracle is allowed to develop to her full potential. It would be unfair to prolong her uncertain status based on what would be nothing more than an unfounded hope that either Garnetta or Kevin may one day step forward.
The ground of failure to rehabilitate, alleged as to both Garnetta and Kevin, has been established by clear and convincing evidence. Both parents, as of the time of trial, remain unable to adequately parent Miracle and they lack both the interest and ability to assume a responsible position in her life within a reasonably foreseeable time in the future. In this case, they have made no progress since the inception of the neglect petition in September 2000.
D. No Ongoing Parent-Child Relationship C.G.S. § 17a-112 (j)(3)(D). CT Page 6782
This is the last ground alleged, and DCF claims it only as to the father, Kevin. The statute defines a parent-child relationship as the relationship that ordinarily develops as a result of a parent having met on a continuing day to day basis the physical, emotional, moral and education needs of the child. It would seem from the plain meaning of the statutory language of this ground that the respondent father clearly has not met the day-to-day parenting capability that the statute appears to require. However, case analysis and interpretation of this ground as it applied to non-custodial parents has crafted somewhat different criteria to determine whether or not there is no ongoing parent-child relationship.
No ongoing parent-child relationship contemplates a situation in which, regardless of fault, a child has never known his or her parent, or that no relationship has ever developed between them, or that the child has lost that relationship so that despite its former existence it has now been completely displaced. In re John G., 53 Conn. App. 12, 22,740 A.2d 496 (1999). The ultimate question usually is whether the child has no present memories or positive feelings for the natural parent. Inre Jessica M., 217 Conn. 459, 468, 586 A.2d 597 (1991); In re Shane P.,58 Conn. App. 234, 240, ___ A.2d ___ (2000); In re Amelia W.,62 Conn. App. 500, 506, ___ A.2d ___ (2001).
In order to prove this ground, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In re John G., supra,53 Conn. App. 22.
Proving the first prong is always problematic in the case of a nonverbal child who has never resided with the parent. Case law has stated that the child's present memories or feelings for the natural parent are determinative. In re Juvenile Appeal, (Anonymous), 177 Conn. 648,670, 420 A.2d 875 (1979); In re Shane P., supra, 58 Conn. App. 240. However, Miracle is not at a stage of development where her actual feelings or memories could even be ascertained.
Another issue is the case of In re Valerie D., 223 Conn. 492, 532,613 A.2d 748 (1992), which held that where the state has acted to prevent a parent-child relationship, particularly when an infant is removed from the custody of a parent shortly after birth, "the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent." CT Page 6783
Kevin M. says he loves Miracle, but his inattentiveness and inaction since her birth belie these words. There is no dispute that Miracle does not recognize Kevin, nor has she formed an attachment to him. No child would bond with a parent who has seen her only twice for approximately one hour since she was two months old. Kevin's mother admitted Miracle did not seem to know who Kevin was.
In re Shane P., supra, 62 Conn. App. 241, distinguished In re ValerieD. from cases where the parent, rather than the state, "created the circumstances that caused or perpetuated the lack of an ongoing relationship between the respondent and [the child]." See also In reAmelia W., supra, 62 Conn. App. 506.
Kevin's own actions, not those of DCF, created and perpetuated the lack of an ongoing parent-child relationship. During the two months Miracle was hospitalized after her birth, Gill tried hard to convince Kevin that he could learn to care for, and assume custody of his daughter. Kevin rejected this plan. He then pursued an irresponsible course, failing to visit his child or to accept services, and continuing to engage in repeated criminal behavior leading to incarceration. Kevin rendered himself unavailable to serve as a parent for Miracle and has never been a significant part of her life. DCF has proven Miracle has no ongoing parent-child relationship with Kevin by clear and convincing evidence.
The court further finds by clear and convincing evidence that to allow Kevin further time for the establishment of a parent-child relationship with Miracle, who does not know him, would be detrimental to her best interests. He has never shown any interest in learning to parent her, and he has done nothing since the filing of the petition to convince the court that when he is released from prison, another six months from now, he would be ready. He is still suggesting that his relatives care for Miracle. Kevin still may have a substance abuse problem to overcome before he can even begin to learn the complexities of caring for Miracle. Nothing is more crucial to the care of Miracle than stability and consistency. This hardly describes Kevin's lifestyle.
The only parental figures Miracle has ever known are her foster parents, particularly her foster mother, who has met and advocated for her special needs. Miracle has made remarkable progress attributable to excellent care. She deserves a chance to grow and develop to her full potential. An uninvolved, or grudgingly involved parent, such as Kevin, will never help her achieve her maximum potential. It was clear to the court that during the trial, Kevin, for the first time, was learning about Miracle's medical struggles. He acknowledged that moving Miracle might not be a good idea. It was clear from his testimony that he still hasn't decided what role he wishes to play in her life. Miracle cannot CT Page 6784 afford and does not deserve to wait any longer.
DCF has proven the third ground alleged as to Kevin M. for the termination of his parental rights by clear and convincing evidence.
 III DISPOSITION
A. Section 17a-112 (k) Criteria
The court has found by clear and convincing evidence that two of the statutory grounds alleged by the petitioner for the termination of parental rights have been proven as to both Garnetta and Kevin.
Before making a decision whether or not to terminate Garnetta and Kevin's parental rights, the court must also consider and make findings on each of the seven criteria set forth in Sec. 17a-112 (k). In Romance M., 229 Conn. 345, 355, 641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
DCF offered timely and appropriate services, to the extent possible, to facilitate reunification. In fact, Gill's efforts were extraordinary and exemplary. The nature and extent of DCF efforts to engage both parents have been more fully discussed at pages two through nine of this decision. DCF's efforts were thwarted thoroughly by the parents' lack of interest and cooperation and by father's incarcerations, which occurred subsequently to DCF's involvement with the family.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
As noted in paragraph (1) above, DCF made reasonable efforts, to the extent possible, to reunite Miracle with her parents. On August 7, 2001, the court found by clear and convincing evidence that efforts toward reunification were no longer appropriate as to either parent.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties CT Page 6785 have fulfilled their expectations."
Specific steps were entered into and approved by the court for both Garnetta and Kevin at the time of Miracle's adjudication and commitment to DCF. In addition, the court issued preliminary specific steps on September 11, 2000. As more fully discussed on pages three through nine of this decision, neither parent even minimally complied with the specific steps.
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties." The federal Adoption Assistance and Child Welfare Act of 1980,42 U.S.C. § 670 et. seq., as amended, mandates that after 12 months in foster care a child must have a plan for a permanent home. In reSamantha B., 45 Conn. Sup. 468, 479, 721 A.2d 1255 (1998). Foster care should be a strictly limited episode in the life of a child. Miracle is securely attached to the P. foster family, where she has been placed for nearly two years, an eternity in the life of an infant. Miracle has no parent-child relationship with Garnetta and Kevin. She has seen each of her parents only twice since her foster care placement 20 months ago.
(5) "The age of the child."
Miracle, born on June 2000, is nearly two.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child."
Garnetta and Kevin have made little effort to adjust their circumstances, conduct or conditions to make it in the best interest of Miracle to return to either parent's care in the foreseeable future. At times, they both failed to keep DCF or their own attorneys notified as to their residences. They both have failed to maintain regular contact with Miracle, DCF or the foster home. They have not contributed regularly any gifts or money toward their daughter's support. They did not send her any cards or letters. In rendering this decision on the grounds alleged for termination, this court found that the derelict conduct of the parents constituted statutory abandonment of Miracle. CT Page 6786
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is no evidence that indicates that DCF or any other person interfered with the parents' abilities to maintain a relationship with Miracle by unreasonable acts or conduct. Indeed, it was their insufficient level of interest in Miracle after her birth, combined with Kevin's own poor judgment and criminal involvement that interfered with establishing a relationship with their daughter. There is no evidence that economic circumstances have constituted a significant factor in their failure to maintain a meaningful relationship with the child. They were offered weekly visits and services by DCF at little or no cost to them, but were never cooperative.
B. Best Interests of the Child
The court must now address the issue of whether the termination of parental rights is in the best interests of the child. This is the dispositional phase of a termination proceeding. In re Valerie D., supra, 223 Conn. 511.
In this case, DCF properly sought the approval of a permanency plan for Miracle after the parents had been given a period of twelve months to rehabilitate. DCF made reasonable and timely efforts to effectuate that permanency plan and the trial on the petition took place when Miracle was only 22 months of age. Miracle, unlike so many children, should not have to suffer the effect of uncertainty or lack of permanency. She is becoming old enough to be fully cognizant of her attachment to her foster parents such that removal from their home would cause her considerable emotional harm as a result of the loss of that bond. Fortunately, despite her intensive medical needs and unpredictable future, a loving, permanent home for Miracle already is secured. Miracle's best interest will be served by expediting the process of legalizing her status in a family that can provide her with the love and specialized care she requires. There is no point in giving either parent any more time to reconsider their lack of commitment to Miracle. Garnetta did not even bother attending the trial, and Kevin's testimony revealed he has little understanding of Miracle's needs. Kevin asserted his "rights" as if this case dealt with a stake in a piece of property; he has no concept of parental responsibility. He admitted that he wasn't proposing that Miracle be moved, and he never convincingly expressed a willingness to provide the care Miracle needs. He suggested that the "lady," Pamela P., the foster mother, be allowed to continue to care for Miracle so long as "I CT Page 6787 can keep my parental rights." His attitude and lack of compassion are absolutely galling.
Based upon the foregoing findings, and having considered all the exhibits and testimony, the court concludes that the evidence is clear and convincing that the best interests of Miracle are served by the termination of her mother and father's parental rights so she may be free for adoption. The court notes that counsel for the child fully supports this result as in the best interests of the child. In fact, as noted by the child's attorney, this is one of the strongest cases for termination the court has heard.
 IV CONCLUSION
The petition is granted and judgment may enter terminating the parental rights of Garnetta H. and Kevin M. in Miracle M. Pursuant to General Statutes Sec. 17a-112 (o), it is ordered that the commissioner of DCF be appointed statutory parent so that Miracle can be placed for adoption. In securing an adoption, the court urges DCF to give first consideration to the P. family.
DCF, the statutory parent will file a written report with the court on or before June 25, 2002 at 9:00 A.M. on a plan for Miracle. Additional reports on the status of an adoption will be filed every three months until such time as an adoption is finalized. For the coming year, written status reports will be filed on or before August 27, 2002, November 26, 2002, and February 25, 2003 at 9:00 A.M. A written motion to review Miracle's plan must be filed with the court on or before April 24, 2003 at 9:00 A.M.[1] DCF must also notify the court immediately, in writing, if an adoption is finalized.
 ___________________ KELLER, J.